[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: DEFENDANT'S MOTION TO SUPPRESS
The defendant filed a motion to suppress a written confession signed on February 28, 1996 at the Hartford Police Station. The motion was contested and tried on December 16, 1999.
The issue raised is whether the defendant knowingly, intelligently and voluntarily waived her rights to an attorney and to remain silent.
The facts adduced could reasonably establish that on February CT Page 16398 24, 1996 on or about 1:30 a.m., at or near 84 Martin Street, Hartford, the defendant participated with Lucis Richardson to rob Colin Williams, a Yellow Taxicab driver. The call for a taxi that morning was a ruse to effectuate a robbery. Upon entering the taxicab, Richardson was armed with a laser gun and the defendant was in possession of a kitchen knife.
The robbery or attempted robbery resulted in the killing of Colin Williams. Death was caused by a knife wound to the victim's heart. At all times herein, the defendant, born on November 22, 1981, was 14 years plus three months of age.
Additionally on February 24, 1996, the defendant was a run-away delinquent from a judicial commitment to an alternative incarceration center for drug abusers. On February 27, 1996, the police seized the defendant and placed her in custody as an illegal run-away from a legally committed pre-trial detention center. On February 8, 1996, the defendant illegally escaped from her assigned alternate incarceration center.
On February 27, 1996, Willie Ledbetter was the defendant's biological father but not her legal guardian. It was unclear whether his parental rights had been terminated. On or about September 6, 1995 the Department of Children and Family (hereinafter, DCF) assumed legal guardianship of the defendant.
On or about February 27, 1996, the defendant's DCF caseworker was Kellena Nelson. On February 27, 1996 the DCF's "hot line" was in operation. The "hot line" is intended, on an equitable rotating basis, to have trained social workers available on a twenty-four basis to respond to children in crisis. Maureen Daly, a DCF social worker, was that evening's designated "hot line" operative. A DCF ward under arrest is deemed a child in crisis.
On February 27, 1996, Daly was informed by the Hartford police that the defendant was being detained for questioning at the station for information of a homicide. Daly arrived at the Hartford station shortly before 11:00 p. m. wherein she was escorted to an interview room where the defendant and her father were waiting. Prior to Daly's arrival, the defendant was alone with her father in the interview room.
The defendant's father, Willie Ledbetter, is a convicted felon currently doing time in the Massachusetts corrections system. The defendant's mother called Ledbetter to inform him CT Page 16399 that the police were looking for his daughter. Ledbetter, on some type of release program, drove to Hartford. He called the Hartford police and was advised that the defendant was being detained for questioning of a homicide and that he was free to be with her and to speak to her at the station.
Ledbetter testified that he and his daughter met privately in the police interview room and discussed the homicidal circumstances of February 26, 1996. After listening to the defendant's version, he advised the defendant to give a statement to the police and to be honest because that was the "Christian" thing to do.
Ledbetter at trial claimed that his advice to his daughter to provide a truthful statement to the police was predicated on his belief that his daughter was only involved in a robbery, that because she was not the killer she would remain under the jurisdiction of the Juvenile Court and would likely be released from custody when she reached the age of eighteen.
Ledbetter claims he did not discuss with his daughter her right to have an attorney, her right to remain silent, and the incriminating consequences as a participant in a felony murder.
Ledbetter testified that based on what the defendant told him he believed that she would be held as a juvenile delinquent and be exposed to a robbery charge with a maximum confinement of four years. He further testified that he was present when Daly arrived and does not recall hearing whether Daly advised the defendant that she had a right to remain silent and that she could have the services of a lawyer.
On cross-examination, Ledbetter stated that he represented to the police that he was the defendant's father and never volunteered that he was no longer the defendant's guardian. Ledbetter conceded that he had a lengthy criminal record including thirty-three arrests and felony convictions including his current confinement for larceny, robbery and burglary.
Ledbetter acknowledged his familiarity with the Miranda rights and warnings and his experience with the arrest and pre-trial criminal procedures. He confirmed the absence of police mistreatment of his daughter; that his daughter's statement was true and that he was seated besides her throughout the entire custodial questioning. Additionally Ledbetter signed as a witness CT Page 16400 to the defendant's confession (Ex. 2) and initialed the defendant's signed Miranda waiver.(Ex. 1).
Upon further questioning Ledbetter testified that his daughter understood the Miranda warnings and the Miranda waivers, and comprehended them.
There was no evidence of police coerciveness or that the defendant's confession, (Ex. 2), was not voluntary. At trial, the defense unequivocally conceded that the defendant's confession and her waiver of Miranda rights were voluntarily entered into.
Daly testified that upon her arrival at the police station, she was escorted into the interview room where the defendant was meeting privately with her father; that the defendant was a committed child and that Ledbetter's rights as defendant's parent were not judicially terminated. Daly thereafter met with the defendant and her father in the privacy of the interview room outside of any police presence.
Daly testified that she informed both the defendant and her father that she was not an attorney; that if the defendant wanted an attorney one would be provided, and that she recommended to the defendant that she secure the services of an attorney; and that it would be in the defendant's best interests to have an attorney. The defendant responded that she wanted to talk to the police. The defendant's father expressed no objection to his daughter talking to the police and encouraged her to give a truthful statement. At that point Daly gave her approval for the interview with the police.
The police were notified and two detectives entered the interview room. The defendant was then read her Miranda rights seriatim and after each right she was asked whether she understood them and if she had any questions about that particular right. Each response was yes, she understood them, and no, she had no questions. The police then read to her the written waiver of Miranda rights. Again after each of the 5 rights and the express waiver (par. 6-Ex. 1) were read to her she was asked whether she understood them and did she have any questions. Each time she responded yes she understood them and no she had no questions.
At all times during the reading of the Miranda rights and their waiver, Daly, Ledbetter and the two police detectives were CT Page 16401 present. Each of the 5 Miranda rights and the express waiver were initialed by the defendant, Daly and Ledbetter. The express waiver was signed by the defendant on February 28, 1996 at 12:04 a.m. and witness signatories were Daly, Ledbetter and the two police officers.
All the trial witnesses testified that the defendant was not under the influence of any drugs or alcohol; that she was unemotional, in control of her faculties, coherent and was proficient in English the language of the rights, waiver and interview. There was no sign of instability or mental disability.
The police interview was conducted in narrative style with one officer occasionally leaving to type what had been disclosed by the defendant. The interview, typing, signing and swearing took approximately 3 hours. The defendant confessed to a plan to rob a taxicab driver and to carrying a concealed kitchen knife into the cab and handing it to Richardson who she claims fatally stabbed the victim.
When the statement was completed, the police asked her to read it, and to make any additions or changes as needed. After reading the statement, the defendant responded that there were no changes or additions to be made. The defendant thereafter signed her statement and it was witnessed by signatories Daly, Ledbetter and the two police detectives. Thereafter a third officer entered and took the defendant's oath that signing the statement was her free act and deed.
It was conceded that the waiver and statement were voluntarily made. The evidence established that there were neither promises nor threats made by the police either prior to or during the questioning. At no time during the interview did the defendant ask for food or beverage nor did she ask to use any toilet facilities. She never at any time requested the presence or opportunity to speak to any attorney nor did she ever request that the interview be terminated before its completion.
It was undisputed that at no time during these proceedings was an explanation of felony murder, conspiracy to commit murder, or aiding and abetting the commission of a murder provided to the defendant.
Ledbetter and Daly testified that the defendant appeared at all times to comprehend and understand the questions propounded CT Page 16402 to her and their significance; that she further appeared to understand and comprehend the Miranda rights and the waiver of such rights.
It was uncontradicted that on February 27, 1996, the DCF Commissioner was the defendant's legal guardian; that Daly was present as a representative of the Commissioner and that she was not the case worker regularly assigned to the defendant.
The police testified that the defendant was not arrested initially but taken into custody as a run-away from a judicially committed alternate incarceration center. That the defendant was left alone in the interview room until her father arrived; that DCF was contacted immediately and that Daly arrived shortly thereafter. The two adults and the defendant were left alone to evaluate the defendant's best course of action. Upon the defendant's expressing a desire to talk to the police, they were so notified and entered the interview room. Their first order of business was to read the defendant her Miranda rights and her waiver of rights. To each inquiry the defendant responded that she understood her rights and the effect of the waiver.
Ledbetter, Daly and the two police officers concluded that the defendant appeared to knowingly understand the Miranda rights, the waiver of rights and the significance of a confession. Throughout these proceedings the defendant never requested to speak to an attorney.
Immediately after the police read the defendant her Miranda rights and she signed the waivers, they informed her that she was a suspect in the pending taxicab driver homicide. This information preceded the police interview.
The police reading of the Miranda rights and waivers commenced at 11:58 p. m. The signing of the waiver forms was completed at 12:04 a.m. The interview was not a series of questions and answers but rather a conversational narrative starting with tell us what happened. The defendant was not placed under arrest for these crimes until her confession was signed and witnessed.
Because the voluntariness of the statement and waiver are conceded by the defense, the thrust of the defendant's motion is that the defendant unknowingly and unintelligently waived her rights to remain silent and to speak to an attorney. The CT Page 16403 defendant at trial testified that she signed the waiver and confession because she believed that she would be charged, at most, with conspiracy to commit robbery; that she would remain under the jurisdiction of the Juvenile Court; and that she would be released upon attaining eighteen years of age; and finally, that upon signing the confession, she would be allowed to return to her home.
Significantly none of this flawed advice was offered by the police or ever referenced by them as part of a contrived effort to elicit a confession. No artifice, deception or misinformation were manufactured by the police at any time during these proceedings.
The defendant testified that she believed, based on what she reports her father told her, that if she told the police what happened she would be going home; that she would not be arrested at least in the criminal adult courts; that neither Daly nor her father explained to her the significance and consequences of a waiver and a signed confession; that she signed her confession because she wanted to go home. She admitted on cross-examination that she remained an escapee and acknowledged her requirement to return to the custody of the Juvenile Court.
She further acknowledged that although seized as a run-away, she was being questioned I for the murder of Colin Williams. She recalled that in her prior Juvenile Court appearance she was represented by a lawyer and knows what lawyers generally do. More significantly, she knew that she did not have to talk to the police but volunteered to talk to the police because she relied upon the misinformation from her father; and that the police never deceived or misled her.
The defendant knew that she could have an attorney prior to talking to the police and denied Daly advised her that it would be better to get an attorney. At trial, the defendant testified that she wanted to give a statement to the police; that nobody forced her because it was her side of the story.
The gravamen of the defendant's case is that she unknowingly waived her rights to remain silent and to have an attorney present because after she disclosed the homicidal details to her father, he concluded that she would be exposed, (1) at most, to a conspiracy to rob and (2) that she would be subject to the jurisdiction of the Juvenile Court; and (3) that she would be CT Page 16404 released no later than her eighteenth birthday.
If, per arguendo, the court were to disregard Daly's admonitions and warnings to the defendant, prior to her answering police questions, the issue then raised by the defense is whether a confession voluntarily given by a defendant minor, predicated on the flawed advice of her father, but no longer her guardian, can meet the test of knowingly and intelligently.
The following findings can be supported by the evidence. There was no police coercion or intimidation. The defendant was mentally competent, stable, unemotional, and fluent in English, the language of the rights, waiver and confession. Sidearms were absent; there were neither threats nor promises; and the confession occurred in a non-confrontational environment. The defendant's signature to the waiver and confession was initialed by her father and Daly. Her confession was read to her and she was rejected the opportunity to make any alterations, deletions or additions.
The defendant's father has had extensive experience with the criminal court system and has had the Miranda rights and waivers presented to him on countless occasions. The defendant herself had a prior Juvenile Court proceeding and acknowledged a prior experience with the Miranda warnings, rights and waiver.
Throughout the entire police questioning, Daly, Ledbetter and the two police officers were present. Prior to the questioning, the defendant met alone first with her father and then with both her father and Daly. The police were never present during these initial meetings. The questioning took approximately 3 hours, a length of time deemed normal for these proceedings.
The court concludes that the defendant who testified was alert, intelligent and self-possessed at the police station; that there were no testimonial inconsistencies with her statement; and that she understood her rights and comprehended the full consequences of a waiver; and that she never requested the services of an attorney.
Daly's testimony of what transpired is found to be more credible than the versions proffered by the defendant and her father. Ledbetter's version of inadvertently misinforming his daughter appeared contrived and biased. But even if, per arguendo, his testimony is accepted, does the defendant's CT Page 16405 reliance on a parent's flawed advice vitiate a waiver voluntarily entered into.
The defendant clearly demonstrated the capacity to understand the Miranda warnings and waiver. That she elected to reject the advice and warnings of Daly, her legal guardian, and instead rely upon the misplaced advice of her father, if that version could be deemed credible, is a risk the consequences of which fall upon the defendant.
No evidence of I.Q. was presented at trial. The defendant's educational level was seventh grade. She clearly possessed the ability to read and write and appeared at trial, although 4 years older, wise and articulate for a person of her age.
Our statutes prescribe that upon the arrest of a child, the police must notify the child's parents and that any admission, confession or statement is inadmissible unless made by such child in the presence of her parent or guardian and after the parent, or guardian and child have been advised of their Miranda rights. Sec. 46b-137 (a).
Although Sec. 46b-137 (a) addresses any proceeding concerning the alleged delinquency of the child . . . this court concludes that similar precautions avail a child caught up in Superior Court criminal proceedings. The presence of Ledbetter and Daly render the defendant's confession compliant with the aforementioned statute.
This court concludes that the defendant had the capacity to understand the warnings given to her, before any police questioning occurred. Further, that she was advised by her guardian of her right to remain silent and to be represented by an attorney and that it would be in her best interest to secure a lawyer.
The defendant's posture, if believed, that she voluntarily signed her waiver and statement because she relied upon her father's misplaced advice that she would only be implicated in a robbery and that she would be released from the Juvenile Court upon reaching age 18, and that no one explained the consequences of a felony murder charge are not a legally sufficient bar to the admission of her confession.
This court concludes that the defense asserted of reliance CT Page 16406 upon misplaced information is an artifice intended to bar the admission of her confession. Under the totality of the circumstances of this issue, the court concludes that the defendant's confession resulted from a knowing, intelligent and voluntary waiver of her Fifth and Sixth Amendment rights.
The motion to suppress is accordingly denied.
SO ORDERED:
Arthur L. Spada, Judge